227 F.Supp.2d 1095 (2002)
Kathleen ERICKSON, Plaintiff,
v.
CHARTER COMMUNICATIONS, INC., Defendant.
No. 4:00CV1794-DJS.
United States District Court, E.D. Missouri, Eastern Division.
April 12, 2002.
*1096 *1097 Drew C. Baebler, James E. Hopkins, Jr., Bauer and Baebler, St. Louis, MO, for plaintiff.
Dennis C. Donnelly, Lisa Demet Martin, Heidi M. Kuns, Bryan Cave LLP, James N. Foster, Jr., McMahon and Berger, St. Louis, MO, for defendant.

ORDER
STOHR, District Judge.
This matter is now before the Court on defendant's motion for summary judgment [Doc. # 56]. Plaintiff Kathleen Erickson is a former employee of defendant Charter Communications. Plaintiff brings her action against defendant under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. and the Missouri Human Rights Act ("MHRA"), R.S.Mo. § 213.010, et seq. She asserts that she was terminated and retaliated against by defendant because of her disability and because she requested reasonable accommodations for her disability. She characterizes her disability as "a back injury and a closed head injury ... which resulted in low back pain and a residual disability of diminished short-term memory and diminished ability to concentrate...." Complaint [Doc. # 1], ¶ 6. Defendant asserts that plaintiff cannot make a prima facie case of discrimination or retaliation and that she was discharged because of poor work performance.
In determining whether summary judgment should issue, the facts and inferences from these facts are viewed in the light most favorable to the non-moving party, and the burden is placed on the movant to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has met this burden, however, the non-moving party may not rest on the allegations in its pleadings but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e). See also 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2739 (1983).
The non-moving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586, 106 S.Ct. 1348. "Where the record as a whole could not lead a rational trier of fact to find for the non-moving party, there is no `genuine issue for trial.'" Id. at 587, 106 S.Ct. 1348. "A court must enter summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Richmond v. Bd. of Regents, 957 F.2d 595, 597 (8th Cir.1992) (citation and quotation marks omitted). Only competent and admissible evidence is appropriate for the Court's consideration in determining whether summary judgment is warranted. See Firemen's Fund Ins. Co. v. Thien, 8 F.3d 1307, 1310 (8th Cir.1993). Generalized allegations of an employer's discriminatory tendencies, without supporting factual detail, or which concern alleged incidents of *1098 which the affiant has no personal knowledge, are not competent or relevant. See, e.g., Berg v. Bruce, 112 F.3d 322, 327-28 (8th Cir.1997).
Unless otherwise indicated, the following facts are undisputed for purposes of the instant motion. Plaintiff Kathleen Erickson worked for defendant Charter Communications, Inc. from November 1994 through August 1999. She began working for defendant in the Regulatory Compliance Department from November 1994 through February 1997. On December 9, 1996, plaintiff was involved in an automobile accident and subsequently experienced severe headaches, memory and concentration problems, neck and back pain, and numbness in her arms. In March 1997, plaintiff left her position as a Regulatory Compliance Manager and began working in defendant's Finance and Acquisitions Department as a Financial Analyst, after applying for the position in December 1996.
Plaintiff requested and was granted a leave of absence approximately three or four weeks after starting her position as a Financial Analyst because of problems related to her accident. Vice President of Finance and Acquisitions Melvin Bryant and Senior Vice President and Chief Financial Officer Kent Kalkwarf were aware of plaintiff's memory and concentration problems. The Finance and Acquisitions Group was defendant's fastest paced group, and plaintiff had difficulty with time-sensitive tasks. See Pltf. Statement of Facts ¶¶ 75, 77. Plaintiff had problems with her work efficiency before her accident. See Pltf. Exh. 2, pp. 2,3 (Performance appraisal dated December 29, 1995 for plaintiff's work in the Regulatory Compliance Department); Def. Statement of Fact ¶ 6. Bryant agreed to give plaintiff less time-sensitive assignments and granted plaintiff's request to work with her office door shut.
On December 30, 1997, Bryant gave plaintiff the lowest possible rating on her performance appraisal for her quantity of work, citing in part to problems with her work timeliness. Def. Exh. 6, p. 2. In March 1998, plaintiff submitted written comments in response to the review, stating in part the following: "constant pain, loss of memory and inability to concentrate resulted in projects taking longer than anticipated, difficulty in switching projects midstream, and ultimately impacting the quantity of assignments that I was able to complete[], regardless of my efforts to work harder, longer and smarter." Def. Exh. 6. At this time, plaintiff did not know that her condition would be permanent because at that point her doctors had informed her the problems were short term. See Pltf. Depo., pp. 181-82. On or about March 23, 1998, plaintiff told Kalkwarf that she had memory and concentration problems and spinal pain as a result of the accident and that she needed help under the ADA.
In approximately May 1998, plaintiff returned to her former position in the Regulatory Compliance Department because Kalkwarf and Director of Regulatory Compliance John McFerron thought it would allow plaintiff to work on assignments that were more familiar and less time sensitive than in Finance and Acquisitions. The Regulatory Compliance Department tended to have work that was not of an immediate time-sensitive nature. See McFerron Depo., Pltf. Exh. 13, p. 49; Pltf. Statement of Fact ¶ 80. In 1998 plaintiff received a chair with lumbar support at her request. McFerron allowed her to close her office door and to work flexible hours.
McFerron changed positions in February 1999 and was no longer plaintiff's supervisor. In late 1998 or early 1999, plaintiff *1099 informed Executive Vice President and Assistant to the President Steve Schumm that she wished to be promoted. In a May 3, 1999 memorandum,[1] Susie Holliday, defendant's new Vice President of Regulation and Planning who was located in Dallas, Texas, criticized plaintiff's work performance, stating in part that plaintiff's work product and attitude were "average to poor" and noting her perception of plaintiff's inability to complete assigned tasks in a timely manner. Pltf. Exh. 15. Despite the company's open door policy,[2] Holliday expressed concern that plaintiff circumvented the chain of command and failed to communicate with Holliday regarding her projects.[3] Holiday expressed her dissatisfaction with plaintiff's performance to Schumm and Vice President of Financial Controls Paul Estes. Plaintiff assumed that Holliday was displeased with her and in fact was told by Schumm that Holliday was not happy with her. Def. Statement of Facts ¶¶ 65,66; Pltf. Statement of Facts ¶¶ 36,37. Kalkwarf was dissatisfied with plaintiff's work on a project with a company in Ireland because she had difficulty with time-sensitive projects and thinking creatively. See Kalkwarf Depo., Pltf. Exh. 12, pp. 26-28; Pltf. Statement of Fact ¶ 38.
In April 1999, plaintiff transferred to defendant's Financial Controls Department at her request. Plaintiff told her supervisor Estes of her memory and concentration problems on her first project for him. On one occasion Estes was critical of plaintiff's inability to remember a co-worker's name.[4] In May 1999, Estes told plaintiff that her work was unsatisfactory.[5] *1100 Estes drafted a memorandum dated May 18, 1999 that includes criticisms of plaintiff's performance.[6] On or about June 30, 1999, Estes wrote a memorandum that plaintiff was not completing assignments by deadlines and that she spent long periods of time away from her desk. Estes did not observe any change in plaintiff's performance between June 30, 1999 and August 9, 1999. Def. Statement of Fact ¶ 77.
On August 9, 1999, a new employee in the Financial Controls Department, Vickie Huffman, called plaintiff and mentioned that she thought plaintiff might be reporting to Huffman. That same day, plaintiff contacted Schumm and defendant's Senior Vice President of Administration Eric Freesmeier to find out whether she would be reporting to Huffman. Estes left town on August 9, 1999 for a business trip through August 11, 1999, and plaintiff did not attempt to leave a voice mail message for Estes or make a cell phone call to Estes before contacting Schumm. Estes received a voice mail message from Schumm the evening of August 9, 1999, relaying the information that plaintiff had talked to Schumm regarding Huffman's phone call.
On August 11, 1999, in the presence of the Payroll/Benefits Manager from defendant's Human Resources Department, Estes told plaintiff that it was inappropriate for her to have contacted Schumm and expressed dissatisfaction with plaintiff's continued poor work performance, suggesting that plaintiff should possibly leave the company.[7] Estes instructed plaintiff to take a week off work at defendant's expense and to call him in a week regarding her employment status.
The parties corresponded between August 11 and August 30, 1999. Plaintiff asserted that she was a disabled individual seeking reasonable accommodation.[8] Defendant expressed the conclusion that plaintiff's work performance had been poor and requested additional documentation and information from plaintiff that she thought would assist defendant in its decision-making regarding her employment status. Plaintiff supplied defendant with copies of her medical records. In a letter dated August 30, 1999, defendant notified plaintiff that her employment was terminated, citing her poor work performance.
The ADA prohibits employment discrimination "against a qualified individual *1101 with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). The MHRA similarly prohibits disability discrimination, and under the MHRA "disability" is defined as the substantial equivalent of "disability" under the federal law. R.S.Mo. §§ 213.055.1(1)(a) and 213.010(10). The familiar burden-shifting framework of McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), applies in disability discrimination cases. Price v. SB Power Tool, 75 F.3d 362, 364-65 (8th Cir.), cert. denied, 519 U.S. 910, 117 S.Ct. 274, 136 L.Ed.2d 197 (1996). ADA and MHRA claims are governed by the same standards. Mathews v. Trilogy Communications, Inc., 143 F.3d 1160, 1164 n. 5 (8th Cir.1998) (citation omitted).
Plaintiff bears the initial burden of demonstrating a prima facie case of discrimination, namely that she is disabled within the meaning of the statutory definitions, that she was qualified to perform the essential functions of her job, either with or without reasonable accommodation, and that she "suffered an adverse employment action under circumstances from which an inference of unlawful discrimination arises." Price, 75 F.3d at 365 (citations omitted). "Disability" is defined in the ADA as:
(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment.
42 U.S.C. § 12102(2).
Plaintiff has difficulty making out the elements of her prima facie case. However, the Court nonetheless assumes without deciding that plaintiff makes the required prima facie showing. Defendant has met its burden of articulating and supporting a nondiscriminatory motive for plaintiff's termination, namely her poor work performance based on "her performance deficiencies in terms of work quality, quantity, and attitude" and her disregard for the chain of command. See Def. Memo. of Law, pp. 1,11. The propriety of summary judgment then turns on plaintiff's ability to present evidence sufficient that a reasonable jury could determine that defendant's proffered reason was pretextual and that the real reason for plaintiff's termination was plaintiff's disability. See Allen v. Interior Construction Services, Ltd., 214 F.3d 978, 983 (8th Cir.2000) (citations omitted).
Plaintiff asserts that defendant's explanation is pretextual and that there is a genuine issue of material fact that she was discharged because of her disability. In her memorandum in opposition, she offers two principal arguments but does not contend there exists a genuine dispute of material fact regarding defendant's perception that plaintiff's work performance was inadequate. First, plaintiff argues that defendant's failure to use progressive discipline creates a genuine issue of fact. In support, she cites to Plaintiff's Exhibit 31, which is comprised of pages 9-11 of defendant's employee handbook. However, the Court has examined the cited pages and does not find any requirement that discipline must be progressive or hierarchical. The handbook states that "[e]ach incidence requiring discipline is unique and supervisors will determine the proper form of discipline that should be used. The different forms of discipline that may be used are: verbal warnings[,]" written warnings[,] final warnings[,] termination[.]" Pltf. Exh. 31, p. 10 (emphasis added). In addition, plaintiff does not present any evidence *1102 that plaintiff was anything but an at-will employee. Furthermore, the Court finds that plaintiff's argument regarding whether her communications with supervisors constituted "verbal warnings" is not material because the employee handbook does not mandate a verbal warning before termination.
Second, plaintiff cites to Fjellestad v. Pizza Hut of America, Inc., 188 F.3d 944, 952 (8th Cir.1999), for the principle that for the purposes of summary judgment, a defendant's failure to engage in an interactive process regarding reasonable accommodations is prima facie evidence that defendant may be acting in bad faith. Focusing on events in August 1999, her last month of employment, plaintiff asserts that "Defendant had been provided with medical records and other documentation of Plaintiff's injuries as well as a request by Plaintiff for reasonable accommodations for her disabilities." Memo. in Opp., p. 11. However, despite plaintiff's emphasis in her memorandum in opposition regarding the August 16, 1999 request for reasonable accommodations, see Memo. in Opp., p.13, the record shows that defendant had already provided certain accommodations for plaintiff's benefit including a chair with lumbar support, flexible hours, allowing her to close her door, giving her less time-sensitive assignments, and transferring her back to a department where she felt comfortable working. See Def. Statement of Facts ¶¶ 33, 47, 49, 50 (undisputed by plaintiff). She provides no competent evidence to the Court of specific requested accommodations which were denied her.
Furthermore, because plaintiff's August 16, 1999 request for reasonable accommodations and her medical records were provided to defendant only after plaintiff was sent home while defendant evaluated her employment, her request for accommodation does not create a genuine dispute of fact. Plaintiff was "pretty sure" on August 11, 1999 that she was going to be discharged, see Pltf. Depo., Exh. of Reply Memo., p. 236, and she took a box of personal possessions home with her, see id. at 106. While plaintiff was not terminated before sending the August 16, 1999 letter, her eleventh-hour request was a request for reinstatement rather than a timely request for reasonable accommodations. See Lowery v. Hazelwood School District, 244 F.3d 654, 658 n. 3 (8th Cir.2001)(finding that "eleventh-hour requests ... are properly understood as requests for reinstatement, not for accommodation" when accommodation request was made after plaintiff was informed that his termination was being recommended to decision-making board). See also Mole v. Buckhorn Rubber Products, Inc., 165 F.3d 1212, 1218 (8th Cir.), cert. denied, 528 U.S. 821, 120 S.Ct. 65, 145 L.Ed.2d 56 (1999).
The Court has carefully reviewed the statements of fact and arguments of both parties and their underlying sources and finds no material dispute of fact regarding defendant's proffered reason for its discharge of plaintiff. Furthermore, the Court notes that plaintiff has presented no evidence that would carry her burden of proof that she was discriminated against based on her disability. Therefore, the Court will grant defendant's motion for summary judgment regarding plaintiff's claim that she was terminated because of her disability in violation of the ADA and MHRA.
For her retaliation claim, plaintiff asserts that "[t]he evidence in this case clearly indicates that Plaintiff was terminated after she requested reasonable accommodations for her disability which would allow her to perform the essential functions of her job at Charter." Memo. in Opp., p. 13. To make her prima facie *1103 case of retaliation, plaintiff "must show that [s]he engaged in protected conduct, that [s]he suffered an adverse employment action, and that the adverse action was causally linked to the protected conduct." Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir.) (citations omitted), cert. denied, 528 U.S. 818, 120 S.Ct. 59, 145 L.Ed.2d 51 (1999).
In support of her retaliation claim, plaintiff cites only to the timing of her request for reasonable accommodations[9] and her August 30, 1999 discharge. However, "[g]enerally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." Id. at 1136 (citations omitted). In this case, when her accommodations request was made while she waited at home to hear word on whether she was discharged, timing alone is not enough. Plaintiff has failed to present evidence that permits a reasonable jury to find that she was fired because she requested a reasonable accommodation. Accordingly, the Court will grant defendant's motion for summary judgment regarding plaintiff's retaliation claim.
For the foregoing reasons,
IT IS HEREBY ORDERED that defendant's motion for summary judgment [Doc. # 56] is granted.
NOTES
[1] Plaintiff asserts in her Statement of Fact ¶ 35 that the "criticisms [in the memorandum] were never brought to the attention of Plaintiff and the memo was never shown to Plaintiff prior to litigation." The Court finds that this fact is not material.
[2] The policy states, in part, "[E]ach employee is encouraged to discuss their issue and/or concern with their immediate supervisor. There may be situations when an employee may not feel comfortable discussing an issue or concern with their supervisor. In these cases, you may request a meeting with your next level of management or the Corporate Human Resources Department." Pltf. Exh. 31, p. 9.
[3] Defendant's Statement of Fact ¶ 58 states that "[a]fter McFerron's departure in February 1999, Holliday and Steve Schumm told plaintiff that she was to report to Holliday." Plaintiff disputes this fact, stating, "Plaintiff indicated that after Mr. McFerron left the St. Louis area she never knew who she was supposed to report to." Pltf. Statement of Fact ¶ 34. The Court finds no genuine issue of material fact regarding Holliday or plaintiff's perceptions of the chain of command.
[4] While Plaintiff's Statement of Fact ¶ 41 states that "Mr. Estes would mock Plaintiff's inability to recall the names of individuals in the company," the Court finds that the portion of plaintiff's deposition to which she cites in support only describes only one incident:

Q: Now, you allege in your complaint that Mr. Estes harassed you. In what way did Mr. Estes harass you?
A: He made fun of my inability to remember people's names.
Q: How did he do that?
A: I had gone  he had sent me to talk to someone upstairs, and it was the same person he had had me talk to a couple times and I just could not get her name right and couldn't remember her name, and he told me, "My God, if you're going to work in this department, you gotta learn her name."
Q: And you took that as harassment?
A: I think that is harassment, yes, sir. Given that I have a memory problem....
A: The conversation was that I couldn't recall the name in his office at that point in time. It wasn't that I couldn't find her name or locate her.
Q: Is that what you were referring to when you alleged that he harassed you?
A: Yes.
Pltf. Depo., Pltf. Exh. 4, pp. 218-221.
[5] Plaintiff asserts in her Statement of Fact ¶ 39 that "[a]lthough Estes indicated that he wasn't happy with Plaintiff's work, Plaintiff indicated that the primary focus of the conversation was regarding Plaintiff's interest in a project associated with telephony." In support, she cites to page 210 of her deposition, where the Court notes she testified regarding her conversation with Estes, "And then he threw in that he wasn't happy with my job." Pltf. Depo., Pltf. Exh. 4, p. 210. There is no genuine dispute of material fact.
[6] Plaintiff asserts that the concerns raised in Estes' May 18, 1999 memorandum were not shared with plaintiff until August 9, 1999 and/or August 11, 1999. See Pltf. Statement of Fact ¶ 42. Plaintiff's cited deposition pages do not, in fact, reference the May 18, 1999 memorandum. Whether Estes expressed his opinions to plaintiff is not material.
[7] Plaintiff asserts that she did not complete a project assigned to her by Estes on August 9, 1999, because she was waiting on information from the auditors. See Pltf. Statement of Fact ¶ 49. Plaintiff does not dispute that it was Estes' belief that the assignment should have taken only two to three hours to complete. See Def. Statement of Fact ¶ 96. The Court finds no genuine dispute of material fact regarding Estes' opinion of plaintiff's work performance.
[8] The Court notes that most of the contents of the August 1999 letters are not referenced by the parties in their arguments. The Court could not and has not considered the contents of the letters for the truth of the matters asserted because they are comprised of inadmissible hearsay and are particularly self-serving to the parties. The Court will consider the letters as competent evidence only to the extent that they provide legal notice.
[9] While plaintiff does not specifically identify the date of the request, the Court presumes that plaintiff is referring to the request in plaintiff's August 16, 1999 letter, which was referenced on the same page of her memorandum in opposition.